Jason R. Naess, ISBN 8407
Assistant United States Trustee
Brett R. Cahoon, ISBN 8607
Andrew S. Jorgensen, ISBN 8695
United States Department of Justice
Office of the United States Trustee
550 West Fort St., Ste. 698
Boise, ID 83724
(208) 334-1300
(208) 334-9756 [Facsimile]
ustp.region18.bs.ecf@usdoj.gov
Attorneys for Acting United States Trustee

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>SHAWN CUTTING, and<br>JANINE CUTTING<br><br>                    Debtors. | Case No. 25-20068-NGH<br><br>Chapter 7 |
| ACTING UNITED STATES TRUSTEE,<br>REGION 18,<br><br>                    Plaintiff,<br><br>v.<br><br>SHAWN CUTTING, and<br>JANINE CUTTING<br><br>                    Defendants. | Adv. No. |

## COMPLAINT OBJECTING TO DISCHARGE UNDER 11 U.S.C. § 727(a)

Plaintiff, Acting United States Trustee Jonas V. Anderson for Region 18 ("United States

Trustee"), for his complaint objecting to the discharge of Defendants Shawn Cutting and Janine

Cutting ("Defendants"), alleges as follows:

1

1.      The United States Bankruptcy Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(a) and 28 U.S.C. § 157.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J) and (O).  Venue is proper in this Court.  28 U.S.C. § 1409(a).

2.      This complaint is timely filed.

3.      Plaintiff is the Acting United States Trustee for Region 18, which includes the District of Idaho.

4.      On information and belief, Courtney Lata is Defendants' adult child.

**Defendants' History of Bankruptcy Filings**

5.      On March 21, 1996, the Defendants filed a chapter 13 bankruptcy in the District of Idaho as Case No. 96-00682.  No plan was confirmed, and the case was dismissed on December 10, 1996.

6.      On February 14, 1997, the Defendants filed a chapter 7 bankruptcy in the District of Idaho as Case No. 97-00408.  This was a "no asset" case, and the Defendants received a discharge in that case on May 21, 1997.

7.      On August 19, 2002, the Defendants filed another chapter 7 bankruptcy in the District of Idaho as Case No. 02-02703.  The case was dismissed based upon Defendants' failure to appear at the 341 meeting.  The Defendants successfully moved to reopen the case and then converted the case to chapter 13.  No plan was confirmed, and the case was ultimately dismissed on September 16, 2003.

8.      On October 31, 2003, the Defendants filed another chapter 13 bankruptcy in the District of Idaho as Case No. 03-03999.  The case was subsequently converted to chapter 7, the Defendants received a discharge on April 29, 2004, and the case was closed as a "no asset" case.

9.      On April 16, 2024, the Defendants filed a chapter 7 bankruptcy in the District of Idaho as Case No. 24-20115 (the "2024 Bankruptcy"). The Defendants never filed schedules, a statement of financial affairs or other documents and the case was ultimately dismissed on September 16, 2024. However, the Defendants did appear and were questioned under oath at a continued 341 meetings of creditors that was conducted on July 25, 2024.

10.     On March 13, 2025, the Defendants, Shawn and Janine Cutting, filed the above captioned bankruptcy case, in which they are the Debtors ("Current Bankruptcy").

## Defendants' Business and Employment History

11.     From approximately 1993 to 2008, the Defendants owned and operated several floor covering businesses.

12.     From 2008 to 2013, Mr. Cutting worked in construction and the Defendants were both involved with network marketing with ViSalus Sciences, SISEL Industries. They were regional directors of a multi-level marketing business in the health and nutrition industry.

13.     From approximately 2015 to 2017, the Defendants were senior marketing directors for World Financial Group (WFG). The Defendants operated their own insurance sales business and were paid a percentage on policies or services they sold. Only Mrs. Cutting "went through all the licensing, passed all the tests and all the producer licenses and everything else that needed to be done for any policy that needed to be written," but they both worked together to sell, market, and find customers.

## Crypto Trading, Creation of Trusts, and Litigation/Judgments

14.     After becoming frustrated with WFG, Mr. Cutting was introduced to cryptocurrency from a friend, and as Mr. Cutting puts it, "[he] had no idea what it was, and so [he] started dabbling in [it]."

3

15.     In or around February or March of 2017, Mr. Cutting invested $900 in crypto and by the end of 2017 his investment had grown to over $100,000.

16.     Mr. Cutting testified that in October 2017, one of his friends on social media asked him what he was doing.  After Mr. Cutting explained to him what he had been doing, investing in cryptocurrency, his friend apparently asked if Mr. Cutting could help him.  Mr. Cutting testified that after about a week he agreed to do it.

17.     Mr. Cutting testified that his friend then asked him to help another friend in connection with helping that friend-of-a-friend's mom retire, and then one of them apparently created a Facebook page and added all his friends.

18.     According to Mr. Cutting, "[they]" talked at every place [they] could in the state of Idaho, saying, 'what's it take to open a trading company for crypto,' and everybody [they] called said, 'There is no licensing, there's nothing required, there's nothing,' and so [they] started doing that."

19.     Mr. Cutting testified that in November or December, it started growing so big that they ended up hiring a gentleman to help them and that they then hired an attorney to set up all their "companies, businesses, EINs, and partnerships, everything."

20.     On or about January 22, 2018, Mr. Cutting formed Crypto Traders Management, LLC ("Crypto Traders Management") as an Idaho Limited Liability Company.

21.     On or around February 4, 2018, the Defendants caused the Lake View Trust to be created with Shawn Cutting, as the Initial Trustee, and Shawn and Janine Cutting together as the "Compliance Officer and Protector of the Trust."

22.     In response to questioning at the 341 Meeting of Creditors in the 2024 Bankruptcy, Mr. Cutting testified that they didn't own any land and explained that they had a

spendthrift discretionary trust set up and that everything was set up through the trust and that he

and his wife didn't convey anything to the trust.  He explained that everything was bought

through the trust name and that the trust is an entity by itself.

23.     According to the Defendants, they paid $50,000 to set up the Lake View Trust.

24.     In or around 2019, the Defendants caused The Lake View Trust to buy certain

real property located at 2282 N. Center Valley Rd., Sandpoint, ID 83864 (the "Sandpoint

Property").  The Lake View Trust also acquired two 5 acre lots in Cocolalla, Idaho (the

"Cocolalla Lots").

25.     When asked whether the Defendants put money into the Lake View Trust to set it

up, Mr. Cutting testified that he didn't remember.  He testified that "the family" put in some of

their vehicles into the Trust, and further explained that his daughter had a car and a truck and a

snowmobile and that his son and son-in-law had a snowmobile and that the Defendants were the

only ones that had the means of transportation for the snowmobiles and so they just put

everything into the trust.

26.     After acquiring the Sandpoint Property, the Defendants obtained a loan to begin

building a home on that property.  Mr. Cutting testified that they lived in the unfinished home

and they weren't able to finish construction because of pending lawsuits.

27.     The Defendants' Crypto Trading Management business ultimately obtained over

450 "investors."  According to Defendant Shawn Cutting's testimony, one of the investors asked

for his money or investment back when the market was down, which ultimately led to a lawsuit,

and then the SEC got involved.

28.     On July 15, 2020, David Powell and Merav Knafo, as plaintiffs, filed a Verified

Complaint against Crypto Traders Management, Shawn Cutting and Courtney Lata, as

defendants, alleging that the defendants to that action had "conned [them] into depositing money by assuring them their investments were growing in value and could be withdrawn at any time when in fact investments were simply being stolen or lost." This lawsuit was assigned Case No. 2:20-cv-00352-BLW for the United States District Court, in the District of Idaho (the "Powell Lawsuit").

29. On March 5, 2021, the SEC filed a Complaint in the United States District Court, in the District of Idaho, as Case No. 2:21-cv-00103-BLW, against Defendants Shawn and Janine Cutting, Crypto Traders Management, Golden Cross Investments, LLC, the Lake View Trust and the Tyson Trust. The Tyson Trust is another trust the Defendants set up at or around the time they set up the Lake View Trust.

30. The SEC Complaint included the following allegations:

a. Since at least October 2017 to present ("Relevant Period"), Cutting has raised at least $6.9 million from over 450 investors by representing that he is a seasoned financial adviser who would pool their money to trade digital assets and return a profit. In truth, Cutting had no experience as a financial adviser, and rather than invest investor money as promised, Cutting used much of the money to pay for various personal expenses, including home improvements, cars, and his daughter's wedding.

b. Cutting perpetuated his fraud by making hundreds of thousands of dollars in Ponzi-like payments to investors and by sending investors false periodic updates that described his purportedly successful trading and investments returns, at time touting gains of over 50% in a single month.

c. Since February 2020, Cutting has either ignored or denied investor requests to withdraw their funds, instead offering excuses, including that his inability to process withdrawals was caused by his efforts to comply with state and federal laws.

d.  Throughout the fraud, Cutting transferred money from investors to his spouse and at least one company and trusts that he owned or controlled.  Each of these Relief Defendants received illicit proceeds from Defendant's fraud to which they have no legitimate claim.

31.     Both Defendants testified at an examination under oath pursuant to Federal Rule of Bankruptcy Procedure 2004 ("2004 examination" conducted by the US Trustee on August 13, 2025) that they never solicited people or investors in Crypto Traders Management, and that neither of them "solicited one person."  Mr. Cutting testified that "[t]hey all came to us.  They would not stop coming to us."  He indicated that people would come to their house and would ask what they're doing.  Defendants lived in a 6,500 square foot house located at 374 Rogstad Powerline Road, Blanchard, ID 83804 ("Blanchard Home"), which will be discussed in more detail below.  Defendants completed construction of the Blanchard House in 2017 or 2018 with money they made from crypto.

32.     The SEC lawsuit ultimately resulted in a Final Judgment being entered on March 29, 2024, against Defendant Shawn Cutting for a civil penalty in the amount of $6,899,969, against Defendant Janine Cutting for disgorgement in the amount of $57,916 together with prejudgment interest in the amount of $1,404, and against other businesses or trusts that were owned or controlled by the Defendants for disgorgement of specific amounts.

33.     The Powell Lawsuit resulted in the court granting summary judgment and default judgment against Defendant Shawn Cutting and Crypto Trading Management.

34.     The Defendants disclosed the Powell Lawsuit and the SEC Lawsuit in response to Question 9 of their statement of financial affairs that they filed with their bankruptcy petition but didn't initially disclose these claims in their schedules.

35.    At the initial 341 Meeting of Creditors in the Current Bankruptcy, conducted on April 16, 2025, Defendants testified that they signed the statements, schedules and documents filed with the Bankruptcy Court, that they reviewed them prior to signing, that they were personally familiar with the information contained in the documents and that all of their assets and creditors were identified in their schedules.

36.    On August 8, 2025, the Defendants amended their Schedule E/F to add and disclose the SEC's unsecured claim, but they still did not include or disclose the unsecured claim arising from the Powell Lawsuit in their amended schedules.

**Undisclosed Business Interests & Connections, and Concealed Account(s)**

37.    On February 10, 2025, approximately one month prior to filing the current bankruptcy, Defendant Janine Cutting formed My Brow Gal, LLC ("My Brow Gal") by filing a Certificate of Organization with the Idaho Secretary of State.  The Defendants' daughter Courtney Lata was identified as the registered agent and Janine Cutting was listed as the Governor and signed the Certificate of Organization as the Organizer.

38.    On February 27, 2025, just *two weeks* prior to filing the current bankruptcy, Defendant Shawn Cutting formed Blackout Mulching and Land Clearing LLC ("Blackout Mulching") by filing a Certificate of Organization with the Idaho Secretary of State.  The Tyson trust was listed as the Governor and Shawn Cutting signed the Certificate of Organization as the Organizer.

39.    Neither of these businesses were disclosed in the Defendants schedules, nor were they disclosed in response to Question 27 of their statement of financial affairs which required their disclosure of any businesses they owned or had certain connections to in the four years prior to filing for bankruptcy.  The only business that the Defendants disclosed was Blackout

8

Unlimited, LLC ("Blackout Unlimited"), which they indicated was in existence "From 02/24/2022 To Current."

40.     On Defendants' Schedule I, they identified Shawn Cutting's employment as a "Heavy Equipment Operator" for Blackout Unlimited, LLC, not as being self-employed with Blackout Mulching.  Defendant Janine Cutting identified herself as unemployed and did not disclose her self-employment at My Brow Gal.

41.     In response to Question 17 of the Defendants' Schedule A/B, where the Defendants were required to disclose any ownership or legal or equitable interest in "Deposits of money," including checking, savings, or other financial accounts, the only account Defendants disclosed was a "Business Account" at Umpqua Bank.  The Defendants indicated that such account had a value of $200 as of the Petition Date.

42.     The "Umpqua Bank - Business Account" that Defendants disclosed in their schedules was a bank account for Blackout Unlimited, LLC.  Upon information and belief, this account was used for both personal and business expenses.  Defendants have testified that they don't have a personal bank account.  As of December 31, 2024, the Defendants had a negative balance in the Umpqua Bank – Business Account.  On or around February, 11, 2025, prior to the Petition Date, the bank wrote off the negative balance and closed the account.

43.     The Defendants failed to disclose the bank account for Blackout Mulching, which upon information and belief was used for personal and business purposes at the time of the bankruptcy filing and afterwards.

44.     On April 16, 2025, at the initial 341 Meeting of Creditors, questioning by the Chapter 7 Trustee led to the disclosure of Blackout Mulching.  After testifying that they had not operated any businesses other than Blackout Unlimited and Blackout Mulching in the past four

years, the United States Trustee specifically questioned the Defendants about My Brow Gal,
which the Defendants acknowledged they had formed and that Defendant Janine Cutting had in
fact offered and performed some services with that business.

45.     On May 1, 2025, the United States Trustee sent an email to Defendants' counsel
requesting copies of account statements for all financial accounts owned or controlled by the
Defendants, or to which they had signatory authority covering the period of January 1, 2023
through March 31, 2025, including any such accounts for the Lake View Trust.

46.     On May 20, 2025, the Chapter 7 Trustee sent an email to Defendants' counsel
requesting the same account statements that the United States Trustee requested.

47.     On May 27, 2025, the United States Trustee received a response from the
Defendants that was forwarded by their counsel's office.  Defendants' response indicated that the
only bank accounts for the Lake View Trust were at Bank of America and Mountain West Bank,
which they claim had been shut down for years due to no activity with the trust.  With respect to
other accounts, Defendant Shawn Cutting stated that "We don't have any statements for this time
frame because all of the businesses were shut down, not operating and no bank accounts."
Defendant Shawn Cutting indicated that "The only 2 businesses that exist is my wife's new
business that she is trying to get off the ground 'My Brow Gal & Esthetics' and 'Blackout
Mulching and Land Clearing' are newer."  The Defendants did not produce any account
statements in this initial response to the United States Trustee and Chapter 7 Trustee's request
for documents.

48.     On May 29, 2025, the United States Trustee sent an email to Defendants' counsel
noting the significant deficiencies in the Defendants' production of documents.  The United
States Trustee also informed Defendants' counsel that he intended conduct a Rule 2004

examination of the Defendants and would include a list of documents for the Defendants to produce in connection with the Rule 2004 examination, many of which the United States Trustee had already requested but had not received.

49.     On June 25, 2025, the United States Trustee received a response email from Defendants' counsel's office, which provided additional information and attached documents in an inaccessible format.  On July 3, 2025, the United States Trustee was provided the same documents in an accessible format.  The only bank statement produced was for a Blackout Mulching bank account with Numerica Credit Union with an account number ending with *8500 covering the period of March 1, 2025 through March 31, 2025.  The statement showed a beginning balance of $1,362.06, which was a clear indication that the account was opened prior to March 1, 2025, but no other account statements were provided.  Nor were any other bank account statements produced.

50.     After receiving a response from Defendants' counsel that Defendants were having a problem getting the bank statements requested, the United States Trustee requested all statements the Defendants had or should have been able to access, information as to all accounts the Defendants have or had that the United States Trustee requested statements for, including the financial institution, account numbers, and timeframes the accounts were utilized, and an explanation as to what efforts the Defendants or their counsel had made to obtain the statements. The response the United States Trustee received was that "Mr. Cutting is having a problem getting the bank statements you have requested.  The SEC shutdown all his accounts in 2021 and now when he contacts the various bank they tell him they have no information to give him because his accounts were shutdown by the SEC."

11

51.     On July 21, 2025, the United States Trustee filed a Motion to conduct a Rule 2004 examination of the Defendants, along with a request for an order requiring the Defendants to produce, among other things, the previously requested account statements but now covering the period of January 1, 2023 through June 30, 2025, and a list of all accounts and the financial institutions where such accounts were held for accounts where no statements were produced.

52.     On August 11, 2025, the United States Trustee sent an email to Defendants' counsel regarding the Defendants' failure to produce the requested documents and expressed concern with the ability to conduct a meaningful examination of the Defendants without the documents being produced.

53.     On August 12, 2025, the Court entered an Order granting the motion requiring the Defendants to appear to be examined under oath on August 13, 2025, and ordering them to produce requested documents and other information.[1]

54.     On August 12, 2025, the Defendants, through counsel, produced bank statements for a Blackout Unlimited account at Umpqua Bank with an account number ending *5859 covering the period of October 2023, which appears to be when the account was opened and February 11, 2025, which is the date that Umpqua Bank apparently wrote off the negative balance in the account as a "Loss Charge Off" and closed the account.  Again, this was the *only* account that the Defendants disclosed in their schedules, and it was actually closed as of the Petition Date.

---

[1] The Motion for 2004 Examination sought an Order requiring production of the documents by August 8, 2025.  Most of the documents had already been requested informally months earlier. The deadline to oppose the Motion for 2004 Examination wasn't until after August 8, 2025, but the Defendants had the Motion and absent any objection, knew or should have known, that the Court's Order would require them to produce the requested documents by August 8, 2025, even though such date was before the date the Court would actually enter an Order requiring production of the documents.

55.    The Defendants also produced statements for a Tyson Trust account identifying both Defendants as Trustees of that Trust and naming them on the account statements.  The statements produced for this account were from Glacier Bank for an account ending *6702. Notably, there was a transfer from this account to a Lake View Trust account in January of 2023, which appears to be an account at Glacier Bank, but Defendants produced no Lake View Trust account statements.

56.    The Defendants also produced two letters from Mountain West Bank indicating that Mr. Cutting and Blackout Unlimited both hold "Charged Off" accounts with Mountain West Bank, but no actual statements were provided.

57.    No additional statements for the Blackout Mulching account ending *8500 were produced at this time, even though it was clear that the account had been opened prior to March 2025.

**Interest in Foreclosed Home and Failure to Disclose Prior or Expected Income Therefrom**

58.    On or around December 10, 2024, shortly after the 2024 Bankruptcy was dismissed, Mr. Cutting as Trustee of the Lake View Trust and both Defendants as guarantors on a certain loan from Legacy Investment Group (II) LLC and Delaney Investments LLC (the "Lenders") entered into an Agreement with the Lenders related to the Foreclosure of a Deed of Trust lien against the Sandpoint Property and the Cocollala Lots.  Under the Agreement, the Defendants indicated they would not file for bankruptcy until after the foreclosure of the Sandpoint Property and Cocollala Lots.  Defendants were allowed to live at the Sandpoint Property after the foreclosure at no cost other than paying for utilities, and were going to be compensated $20,000 to maintain, service, improve and assist with any eventual sale of that property.  Upon the eventual sale of either the Sandpoint Property or one of the Cocollala Lots,

Mr. Cutting was to receive an additional $20,000.  Upon the sale of all three parcels, Mr. Cutting

would receive at least $40,000 more, for a total of $80,000 and perhaps more depending on how

much the properties sold for.  The Defendants agreed not to remove, sell, exchange, pledge, gift

or dispose of the appliances, generator transfer switch, equipment, fixtures, etc.

59.     Due to a noticing issue, the Sherrif's sale of the Sandpoint Property had to be

rescheduled.  On or about January 17, 2025, the Defendants and Lenders entered into a First

Amendment to Agreement ("Amended Agreement"), whereby the Defendants agreed not to file

for bankruptcy until after the Sheriff's Sale of the Sandpoint Property, which was anticipated to

be completed by February 28, 2025.  The Amended Agreement was like the original Agreement,

but instead provided for an immediate payment of $7,500, with the remaining $12,500 to be paid

after the Sheriff's sale of the Sandpoint Property.  The Defendants would be paid another

$20,000 when one of the three properties was sold, and could receive another $40,000 or more

upon the sale of all three parcels, but the formula and determination of the amount of the final

payment to the Defendants was modified slightly under the Amended Agreement.

60.     On August 13, 2025, the United States Trustee questioned the Defendants about

the Agreement(s) with the Lenders at the Defendants' 2004 examination.   Mr. Cutting testified

that he did in fact receive the initial $7,500 payment from the Lenders.  He also testified that he

received the second $12,500 payment after the Sherrif's Sale of the Sandpoint Property was

completed.

61.     The United States Trustee questioned the Defendants about whether the $12,500

was deposited into a bank account.  Mr. Cutting responded, "Most likely."  When asked what

account the funds would have been transferred into, Mr. Cutting responded that it would have

been the Blackout Mulching business account.

62.     As noted previously, this account was not disclosed in the Defendants' schedules, nor was the company Blackout Mulching disclosed in the Defendants' schedules or statement of financial affairs.  The Defendants only produced the March 2025 statement for this account, not the February 2025 statement that would have included the $12,500 deposit.

63.     The United States Trustee subsequently obtained copies of additional Blackout Mulching bank statements.  The February 2025 statement for that account shows a $12,500 deposit into that account on February 27, 2025, which was the date the account was opened— just 14 days prior to when the Defendants filed for bankruptcy.  In addition, that statement shows that the Defendants made two "Withdrawals by Check" from that account on February 28, 2025, totaling $6,605.00.  The Defendants' schedules only disclose cash on hand as of the Petition Date in the amount of $300.

64.     The Defendants received the initial $7,500 payment on or around January 17, 2025, by a wire transfer from the Lenders.  The United States Trustee has not been provided any documents from the Defendants that identify what account those funds were wired to.

65.     The Defendants did not disclose the $20,000 in income they received shortly before the bankruptcy filing in their statement of financial affairs, nor did they disclose the fact that they were entitled to receive an additional $20,000 upon the sale of the Sandpoint Property or Cocollala Lots in their schedules or in response to questioning at their 341 Meeting of Creditors, including the specific question, "Does anyone owe you money?"

**Transfers and Transactions with Daughter**

66.     At the Defendants 2004 examination, Mr. Cutting testified that they ultimately sold their 6,500 square foot home, the Blanchard Home, for "1.1 or something."   According to

his testimony, "after the kids moved out, it was too big," and he thought, "like, well, this is stupid.  We gotta downsize."

67.     The sale of the Blanchard Home occurred on or about July 21, 2020.  The sale price was $1,150,000.00.  However, the "Seller" of the Blanchard Home was not the Defendants or one of their trusts; instead, the Seller was their daughter.

68.     At some point prior to 2020, the Blanchard Home had been transferred to the Defendants' daughter, Courtney Lata.

69.     In addition, the Defendants had caused the Blanchard Home to be encumbered by a lien in the approximate amount of $430,000.  The proceeds from that loan were apparently used by the Defendants, in large part, to build a home on the Sandpoint Property.

70.     The net proceeds due and paid to the Seller when the Blanchard Home was sold were approximately $643,802.00, and although the Defendants' daughter was the Seller, Mr. Cutting testified that they ultimately received the $643,802 from their daughter.

71.     At the initial 341 Meeting of Creditors, the Defendants were asked if they had transferred, sold or given any money or assets to their daughter Courtney or her husband, Adam. Mr. Cutting responded, "No."

72.     This response was followed up with examples of potential transfers, such as, "cars, money, gifts or anything of value."  Mr. Cutting then asked for clarification as to the timeframe that he was being questioned about, to which the questioner responded, "since [Adam and Courtney have] been married."  Mr. Cutting responded, "I don't recall."  Mrs. Cutting did not offer a response to the questioning.

73.     At the initial 341 Meeting of Creditors, the Defendants were also asked if they had made any transfers of value in the past four years, whether they had repaid any debts to

16

family or friends in the past year, or whether they had paid anyone else's bills in the past year. The Defendants responded "no" to all of these questions.

74.     Later at the initial 341 meeting of Creditors, Mr. Cutting was asked how he gets to and from work.  Mr. Cutting testified and explained that he uses a truck that his daughter bought, and that if he can afford the payment he pays her, but if not she pays it.  This vehicle was not disclosed in response to Question 23 in the Defendants' statement of financial affairs, which required them to disclose any property that they hold or control that someone else owns.

75.     The Defendants were questioned about any other vehicles they used or had access to in connection with questioning about how Mrs. Cutting got around, Mr. Cutting explained that Adam Lata, their son-in-law, ended up buying a car for Mrs. Cutting to use to get to her medical appointments and anything else she needs.  When asked whether they had an agreement to use the car or a payment obligation, the Defendants responded, "No," but explained that they try to pay any chance they can and that the only condition was that the Defendants would maintain insurance on it.  This vehicle was not disclosed in response to Question 23 in the Defendants' statement of financial affairs, which required them to disclose any property that they hold or control that someone else owns.

76.     The Defendants responded in the negative to Questions 7 and 8 of their statement of financial affairs that required them to disclose payments on debts to insiders, or payments or transfers of property on account of debt that benefited an insider.

77.     The Defendants, through a Blackout Unlimited Venmo account, made the following payments to Courtney Lata, containing the following descriptions or notations:

| Date | Amount | Notation/Description |
|------|--------|----------------------|
| 2020-03-01 | $2,005.00 | March 2024 truck, trailer and insurance |
| 2024-04-03 | $1,905.00 | April, thank you! |

| 2024-05-03 | $1,905.00 | May, Thank you very much! |
| 2024-06-06 | $1,905.00 | June, thank you! |
| 2024-07-10 | $3,300.00 | Rent, thank you! |
| 2024-07-18 | $1,905.00 | July payments. Thank you!!!!! |
| 2024-08-17 | $1,905.00 | August, thank you! |
| 2024-09-02 | $3,200.00 | Sept Rent! |
| 2024-09-02 | $100.00 | Additional rent |
| 2024-11-28 | $1,140.00 | Tilt trailer, other trailer and insurance |
| 2024-12-11 | $1,930.00 | Truck, both trailers and insurance. Thank you Buggy! |

78.    In addition to the $3,300 rent payments that Defendants made to Courtney Lata, Defendants made payments in the amount of $3,300 directly to Brian Bensing for November 2024, December 2024, January 2025, and April 2025 "rent," and made an additional payment to Brian Bensing in late April 2024 in the same amount with the notation "Just because! Thank you."  In addition, there was a "Withdrawal by Check" in the amount of $3,300 on February 28, 2025 from Defendants' undisclosed Blackout Mulching bank account.

79.    On or about October 31, 2024, Mr. Cutting made a payment through his PayPal account in the amount of $1,851.19 to Perfection Tire and Auto Repair.

80.    The Defendants also made numerous payments directly to Chrysler Capital throughout 2023 and 2024 (including a payment of $1,666.30 on December 19, 2024), even though they've asserted they don't own a vehicle and testified and attested in writing that they haven't paid somebody else's bills.

**<u>Acquisition of Gold/Silver, Continued Investment in Crypto, and Other Concealed Interests</u>**

81.    At the Defendants' initial 341 Meeting of Creditors, they were asked whether they owned any gold or silver coins.  Mr. Cutting testified that they had off and on their entire life, but "haven't in the last few years, four or five maybe."

82.     Upon information and belief, between August 6, 2018 and September 17, 2019, while Defendants were operating Crypto Traders Management, Mr. Cutting invested over $100,000 in silver or gold.

83.     Mr. Cutting testified that he sold all of it back in 2019 or 2020, but has not produced documentation to verify this or to show that he no longer has all or any portion of the silver or gold he acquired between 2018 and 2019.

84.     On July 25, 2024, during the 341 Meeting of Creditors in the Defendants' 2024 Bankruptcy, the Defendants were asked whether they had any cryptocurrency.  Mr. Cutting responded, "No.  No.  Everything is, there's a, the SEC ended up, uh, with we couldn't afford attorneys, uh, after three years, uh, the SEC ended up getting a judgment against us."  Mr. Cutting was then asked if the SEC liquidated the remaining crypto.  Mr. Cutting responded that everything that was left got used up between attorneys, and emphasized that "we got nothing," and explained that everything went to the SEC or attorneys.

85.     At the Defendants' 2004 examination, Mr. Cutting was asked about whether he had invested in cryptocurrency since things fell apart with Crypto Traders Management and the SEC litigation.  Mr. Cutting testified that the SEC froze his accounts and that he hasn't had access to the account since 2021.  He did testify that "every now and then, I'll buy, you know, something like, you know a hundred dollars or $500 or $300 of something."

86.     Mr. Cutting explained that the only way he can invest is through something like Venmo.  Mr. Cutting was asked whether he had invested in crypto since then through somebody else, like through his daughter, son, or wife?  Mr. Cutting testified that, "Anything I buy is 100, 200, $300 that I can try to make money, try and make it grow in three or four days before I have to sell it.  Zero.  I've had zero for years."  Later in the examination, Mr. Cutting was asked about

several large transactions identified in the Blackout Unlimited bank account statements, an account the Defendants used for business and personal purposes.

87.     Specifically, Mr. Cutting was asked about three debits from that account between March 26, 2024 through March 29, 2024, each in the amount of $2,500, and two other debits in the amount of $1,000 and $1,500 in that same time frame.  These transactions all contained the description, "Upho*shawncutting Internet NY Xxxxxxxxxxxx4918."  Mr. Cutting explained that "Uphold is a crypto exchange."  Mr. Cutting admitted in response to follow-up questions that he in fact invested $10,000 in crypto at the end of March 2024.

88.     Mr. Cutting indicated that he would be able to get Uphold statements from January 1, 2023 through the present time, that show all his crypto investments.  However, he has not produced those statements to the United States Trustee or the chapter 7 trustee.

89.     Contrary to Mr. Cutting's earlier testimony that he's had "zero" crypto for years, or that anything he invested or bought in crypto was only $100, $200 or $300, he had actually invested thousands of dollars on numerous occasions since the SEC litigation and the asserted freezing of his crypto accounts.  Noteworthy investments in crypto by Defendants include:

      a.   $5,000 to Uphold on July 24, 2025, just the day prior to Mr. Cutting's testimony in the 2024 Bankruptcy on July 25, 2025, that he did not have any cryptocurrency; and

      b.   investment of an additional $26,500 in cryptocurrency between July 15, 2024 and July 22, 2024, for total crypto investments of over $30,000 in the ten days prior to testifying that he had none.

90.     In response to Question 22 of the Defendants statement of financial affairs the Defendants responded "No" to the question, "Have you stored property in a storage unit or place

other than your home within 1 year before you filed for bankruptcy?" However, the Defendants

made the following payments from Mr. Cutting's PayPal account within approximately two

months of the Petition date:

| 01/11/2025 | General Authorization: PY *STORAGEMART 0271 ID: 9SB72518YE663453X | Pending | USD | -186.97 |
|---|---|---|---|---|
| 01/11/2025 | General Authorization: PY *STORAGEMART 0271 ID: 2VX54100HJ8185009 | Pending | USD | -58.81 |
| 02/03/2025 | General Authorization: PY *STORAGEMART 0271 ID: 87575800KT313133D | Pending | USD | -186.97 |
| 02/06/2025 | General Authorization: PY *STORAGEMART 0271 ID: 7CU64758DP285894W | Pending | USD | -64.00 |

Upon information and belief, these payments were made to StorageMart, a self-storage company

that offers drive-up storage units and RV and boat storage in Hayden, ID.

**Failure to Fully Comply with Order for 2004 Examination**

91.     As noted previously, the Court entered an Order requiring the Defendants to

appear and be examined under oath pursuant to a Rule 2004 Examination. In addition, the

Defendants were ordered to produce certain documents to the United States Trustee prior to the

examination. The 2004 Examination was scheduled for August 13, 2025, at 10:00 a.m.

(MT)/9:00 (PT). The Defendants appeared at that date and time, but partway through the

meeting Defendants' counsel indicated that the Defendants needed to be done by 2:15 p.m.

(MT). Because of the limited time to question the Defendants, and due to the limited time to

review documents produced just the day before the examination, and due to the Defendants'

failure to produce all of the requested documents and information, which the Court's order

required them to produce, the 2004 Examination was continued.

92.     The United States Trustee coordinated with Defendants' counsel for the continued 2004 Examination to occur on September 25, 2025, at 10:00 a.m. (MT)/9:00 a.m. (PT).

93.     On September 16, 2025, the United States Trustee sent an email to Defendants' counsel advising that no additional documents had been produced, nor had the Defendants produced a list of accounts that Defendants claimed they couldn't get statements for.

94.     On September 18, 2025, one week prior to the date set for the Defendants' continued 2004 examination, the Defendants produced additional statements for the Blackout Mulching Numerica Account covering the period of February through June of 2025, and Defendants produced personal PayPal and Blackout Unlimited Venmo Statements that were not disclosed in the Defendants' schedules.  On September 23, 2025, the day before the date set for the continued 2004 examination, Defendants produced statements for Mrs. Cuttings Venmo account.  On the Petition Date, Mrs. Cutting had a balance of approximately $482.89 in her Venmo account.  The existence of this account or balance was not disclosed in Defendants' schedules.

95.     On September 25, 2025, at approximately 7:31 a.m. (MT), just 2.5 hours before the continued 2004 Examination was set to take place, Defendants' counsel emailed the United States Trustee and stated, "Due to unforeseen circumstances the deposition cannot happen today."  That was the entirety of the email message.

96.     Defendants have not arranged a new date and time for the 2004 Examination, nor have they produced all of the documents and information they were ordered to produce pursuant to the Order Granting the Acting United States Trustee's Motion for Examination of Debtors Under Fed. R. Bankr. P. 2004 (Case No. 25-20068-NGH, Dkt. No. 35).

<u>COUNT I</u>
**(False Oath and Account – Failure to Disclose Business Interests and Connections**
**11 U.S.C. § 727(a)(4))**

97.     The United States Trustee incorporates paragraphs 1 through 96 as if alleged

herein.

98.     The United States Trustee is informed and believes and, based thereon, alleges the

Defendants made the following material false oaths and accounts regarding their various

business interests and connections:

      a.   Failing to disclose their ownership interest in, or other connections to, My

          Brow Gal, LLC in response to question 19 of their Schedule A/B or question

          27 of their statement of financial affairs;

      b.   Failing to disclose their ownership interest in, or other connections to,

          Blackout Mulching and Land Clearing LLC in response to question 19 of their

          Schedule A/B or question 27 of their statement of financial affairs; and

      c.   Testifying at their 341 Meeting of Creditors that their statements, schedules

          and documents filed in the bankruptcy were complete and accurate, that there

          were no errors or omissions, and that all of their assets were identified in their

          schedules.

99.     The Defendants verified the false statements in their schedules and statement of

financial affairs under penalty of perjury and they constitute false oaths.

100.    The United States Trustee is informed and believes and, based thereon, alleges

that the Defendants knowingly and fraudulently made the false oaths and accounts alleged above

and that their discharge should be denied under 11 U.S.C. § 727(a)(4)(A).

<u>COUNT II</u>
**(False Oath and Account – Failure to Accurately or Fully Disclose Financial Accounts
11 U.S.C. § 727(a)(4))**

101.    The United States Trustee incorporates paragraphs 1 through 100 as if alleged

herein.

102.    The United States Trustee is informed and believes and, based thereon, alleges the

Defendants made the following material false oaths and accounts regarding their financial

accounts:

   a.   Identifying the "Umpqua Bank – Business Account" as their only Deposit of

       Money in response to question 17 of their Schedule A/B and indicating that

       such account had a balance of $200, where such account actually had a

       negative balance months prior to the bankruptcy filing and had been zeroed

       out and closed prior to the Petition Date, and by failing to properly disclose

       that account in response to question 20 of their statement of financial affairs,

       which requires the disclosure of any financial accounts that were closed

       within one year prior to the bankruptcy filing;

   b.   Failing to disclose the Numerica bank account for Blackout Mulching,

       Account No. *8500, which the Defendants opened just two weeks prior to the

       bankruptcy and wherein they deposited $12,500 they received under their

       agreement with the Lenders pertaining to the foreclosure of the Sandpoint

       Property;

   c.   Failing to disclose Venmo and PayPal accounts and the balance in those

       accounts in their schedules; and

     d.   Testifying at their 341 Meeting of creditors that all of their assets were included in their schedules, and that there were no errors or omissions in their schedules.

103.    The Defendants verified the false statements in their schedules and statement of financial affairs under penalty of perjury and they constitute false oaths.

104.    The United States Trustee is informed and believes and, based thereon, alleges that the Defendants knowingly and fraudulently made the false oaths and accounts alleged above and that their discharge should be denied under 11 U.S.C. § 727(a)(4)(A).

### COUNT III
**(False Oath and Account and/or Failure to Explain Loss of Assets – Cash
11 U.S.C. § 727(a)(4) or 11 U.S.C. § 727(a)(5))**

105.    The United States Trustee incorporates paragraphs 1 through 104 as if alleged herein.

106.    The United States Trustee is informed and believes, and based thereon, alleges the Defendants made a false oaths and accounts regarding Cash on hand as of the date of their bankruptcy filing by only disclosing $300 in cash.

107.    Defendants bank statements for the undisclosed bank account show the Defendants withdrew $6,605.00 less than two weeks prior to the bankruptcy filing.

108.    The Defendants verified the false statements in their schedules and statement of financial affairs under penalty of perjury and they constitute false oaths.

109.    Additionally, or in the alternative, the Defendants have failed to explain satisfactorily the loss or disposition of this withdrawn cash.  The Defendants failed to appear at the continued 2004 examination to answer questions related to these and other transactions and related to the withdrawal and/or disposition of the cash.

110.    The United States Trustee is informed and believes and, based thereon, alleges that the Defendants knowingly and fraudulently made the false oath and account alleged above and have failed to explain the loss or disposition of the withdrawn cash and that their discharge should be denied under 11 U.S.C. § 727(a)(4)(A) and/or (a)(5).

### <u>COUNT IV</u>
**(False Oath and Account and/or Concealment– Failure to Disclose Interest in Vehicles**
**11 U.S.C. § 727(a)(4) or (a)(2))**

111.    The United States Trustee incorporates paragraphs 1 through 110 as if alleged herein.

112.    The United States Trustee is informed and believes, and based thereon, alleges the Defendants made the following material false oaths and accounts regarding vehicles that they secretly owned, had an equitable interest in, or otherwise had possession of, and offered additional false testimony related to such vehicles:

      a.  At a minimum, Defendants held or controlled at least two vehicles that were apparently titled in the names of Defendants' daughter and/or son-in-law. This should have been disclosed in response to Question 23 of their statement of financial affairs that requires debtors to disclose property they hold or control that someone else owns, including any borrowed property;

      b.  Alternatively, Defendants had a legal or equitable interest in the vehicles as they made all or a majority of the payments towards the purchase of the vehicles, paid to insure the vehicles, and paid to maintain the vehicles, and the vehicles constitute property of the Defendants or the bankruptcy estate which was concealed and should have been disclosed in response to Question 3 of their Schedule A/B; and

26

    c.   Defendants testimony that they had not repaid debts to family or friends in the past year, and that they had not paid anyone else's bills in the past year was false based upon the numerous payments they made to their daughter or directly to Chrysler Capital to cover the car payments on the vehicles.

113.    The Defendants verified the false statements in their schedules and statement of financial affairs under penalty of perjury and they constitute false oaths.

114.    The United States Trustee is informed and believes and, based thereon, alleges that the Defendants knowingly and fraudulently made the false oaths and accounts alleged above and that their discharge should be denied under 11 U.S.C. § 727(a)(4)(A).

115.    In addition, or alternatively, the Defendants concealed their interest in the vehicles by causing them to be titled in their daughter and/or son-in-law's names to hinder, delay, or defraud their creditors and/or the chapter 7 bankruptcy trustee and their discharge should be denied under 11 U.S.C. § 727(a)(2).

## COUNT V
**(False Oath and Account in the Current Bankruptcy and the 2024 Bankruptcy – Crypto
11 U.S.C. § 727(a)(4)(A) and 727(a)(7))**

116.    The United States Trustee incorporates paragraphs 1 through 115 as if alleged herein.

117.    The United States Trustee is informed and believes and, based thereon, alleges Defendants made the following material false oaths and accounts regarding their investments in cryptocurrency:

    a.   Testifying at the 341 Meeting in the 2024 Bankruptcy that they had no cryptocurrency;

      b.   Testifying at the 2004 Examination that the only money they've invested in

Crypto since the SEC shutdown their crypto accounts was 100, 200, $300, that

they don't have money to invest and that he's had zero for years;

118.    The United States Trustee is informed and believes and, based thereon, alleges

that Defendants knowingly and fraudulently made the false oaths and accounts alleged above and

that their discharge should be denied under 11 U.S.C. § 727(a)(4)(A) and under § 727(a)(7) and

(a)(4)(A).

### <u>COUNT VI</u>
**(False Oath or Account and Concealment – Income Related to Foreclosures
11 U.S.C. § 727(a)(4)(A) and (a)(2))**

119.    The United States Trustee incorporates paragraphs 1 through 118 as if alleged

herein.

120.    The United States Trustee is informed and believes and, based thereon, alleges

Defendant made the following material false oaths and accounts in connection with the

Agreements they entered into with Lenders, which provided for significant payments to

Defendants both before and after bankruptcy filing:

      a.   Failing to disclose the Agreements or the money owed to them in response to

Questions 30 or 35 of their Schedule A/B, or as an Executory Contract in

Schedule G;

      b.   Failing to disclose the income they had received prior to the bankruptcy in

response to Question 5 of their statement of financial affairs; and

      c.   Testifying at their 341 Meeting that nobody owed them any money.

121.    The Defendants verified the false statements in their schedules and statement of

financial affairs under penalty of perjury and they constitute false oaths.

122.    In addition to failing to disclose the Agreements or the income they had received or expected to receive under the Agreements, the Defendants concealed the income they had received by withholding bank statements that evidenced their receipt of approximately $20,000 shortly before the bankruptcy filing.

123.    The United States Trustee is informed and believes and, based thereon, alleges that Defendants knowingly and fraudulently made the false oaths and accounts alleged above and that their discharge should be denied under 11 U.S.C. § 727(a)(7) and (a)(4)(A).

124.    In addition, or alternatively, the Defendants concealed their interests under the Agreements and the income they received shortly before filing the bankruptcy and their discharge should be denied under 11 U.S.C. § 727(a)(2).

## COUNT VII
### (False Oath And Account – Storage Unit(s)
### 11 U.S.C. § 727(a)(4)(A))

125.    The United States Trustee incorporates paragraphs 1 through 124 as if alleged herein.

126.    The United States Trustee is informed and believes and, based thereon, alleges Defendant made a material false oath and account by responding, "No," to question 22 of their statement of financial affairs, which asks whether debtors have stored property in a storage unit or place other than your home within 1 year before the bankruptcy filing.

127.    The Defendant verified the false statements in their statement of financial affairs under penalty of perjury and they constitute false oaths.

128.    The United States Trustee is informed and believes and, based thereon, alleges that Defendants knowingly and fraudulently made the false oaths and accounts alleged above and that their discharge should be denied under 11 U.S.C. § 727(a)(4)(A).

## COUNT VIII
### (False Oath And Account – Undisclosed Creditors and Claims
### 11 U.S.C. § 727(a)(4)(A))

129.     The United States Trustee incorporates paragraphs 1 through 128 as if alleged

herein.

130.     The United States Trustee is informed and believes and, based thereon, alleges

Defendant made a material false oath and account by failing to disclose the SEC's claim or the

claim arising from the Powell Litigation in their Schedule E/F, and by testifying at their 341

Meeting that all of their creditors were listed in their schedules.

131.     The Defendants verified the false statements in their schedules under penalty of

perjury and they constitute false oaths.

132.     The United States Trustee is informed and believes and, based thereon, alleges

that Defendants knowingly and fraudulently made the false oaths and accounts alleged above and

that their discharge should be denied under 11 U.S.C. § 727(a)(4)(A).

## COUNT IX
### (Failure to Keep or Preserve Books or Records and Failure to Explain Loss of Assets
### 11 U.S.C. § 727(a)(3) and (a)(5))

133.     The United States Trustee incorporates paragraphs 1 through 132 as if alleged

herein.

134.     The Defendants failed to keep or preserve books, documents, records or papers

from which the debtor's financial condition or business transactions might be ascertained,

including failing to keep, preserve or produce the following:

a.   Documents showing the sale or other disposition of substantial investments in

silver or gold, and supporting their assertions and testimony that they did not

have any silver or gold a the time of their testimony or as of the Petition Date;

b.   Documents evidencing their investments in cryptocurrency, including documentation to support their testimony that they no longer had any cryptocurrency; and

c.   Account statements for their personal, business or trust accounts.

135.   The United States Trustee is informed and believes and, based thereon, alleges that the Defendants' failure to keep, preserve or produce the books, records, or documents above is not justified under the circumstances of the case and that their discharge should be denied under 11 U.S.C. § 727(a)(3).

136.   The United States Trustee is informed and believes that the Defendants have failed to explain satisfactorily the loss or disposition of their investments in silver, gold and/or cryptocurrency and that their discharge should be denied under 11 U.S.C. § 727(a)(5).

### <u>COUNT X</u>
**(Failure to Produce Documents to Chapter 7 Trustee – Account Statements
11 U.S.C. § 727(a)(4)(D))**

137.   The United States Trustee incorporates paragraphs 1 through 136 as if alleged herein.

138.   The Defendants withheld certain recorded information from the chapter 7 trustee, specifically account statements for all financial accounts owned or controlled by the Defendants.

139.   The United States Trustee is informed and believes that the withholding of these documents was done knowingly and fraudulently and that the documents requested relate to the Defendants' property of financial affairs and that their discharge should be denied under 11 U.S.C. § 727(a)(4)(D).

<u>**COUNT XI**</u>
**(Refusal to Obey a Lawful Order of the Court –2004 Exam and Production of Documents
11 U.S.C. § 727(a)(6))**

140.    The United States Trustee incorporates paragraphs 1 through 139 as if alleged

herein.

141.    The Defendants had knowledge of the Court's Order requiring them to appear and

be examined under oath pursuant to a Rule 2004 Examination and had knowledge of the

requirement within such Order to produce documents to the United States Trustee.

142.    The Defendants failed to fully comply with the Court's Order by failing to

produce timely the documents they were required to produce and as of the date of this Complaint

they have still not produced all the requested documents.  In addition, the Defendants did not

make arrangements to allow for the examination to be completed, and they failed to appear at the

continued 2004 examination at the date and time the parties agreed upon.

143.    The United States Trustee is informed and believes the Defendants refusal to obey

the Court's Order Granting the Acting United States Trustee's Motion for Examination of

Debtors Under Fed. R. Bankr. P. 2004 is grounds for denial of the Defendants' discharge and

that their discharge should be denied pursuant to 11 U.S.C. § 727(a)(6).

**PRAYER FOR RELIEF**

Wherefore, the United States Trustee respectfully prays for judgment denying

Defendants' discharge, costs of suit, and for such other relief as the Court deems proper.

Date: December 18, 2025                                    JONAS V. ANDERSON
                                                          Acting United States Trustee for Region 18


                                                          /s/ Brett R. Cahoon
                                                          BRETT R. CAHOON
                                                          brett.r.cahoon@usdoj.gov